Patricia **CHARVET**, Appellant

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO.**

No. 83–1641.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1984.

Decided June 22, 1984.

Donald S. Arbour, Washington, D.C., with whom Terence P. Boyle and Judith Hall Howard, Washington, D.C., were on the brief, for appellant.

Ernest L. Mathews, Jr., New York City, with whom Charles R. Goldburg and Thomas W. Gleason, New York City, were on the brief, for appellee. Julian H. Singman, Washington, D.C., also entered an appearance for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and HARRIS,* District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case we are asked to decide the limits on standing to sue under section 303(b) of the Labor Management Relations Act ("LMRA").[1] Appellant Patricia Charvet sued the appellee International Longshoremen's Association ("ILA") under section 303(b) for damages allegedly sustained as a result of an illegal secondary boycott conducted by the ILA. The essence of the appellant's complaint is that the ILA engaged in a secondary boycott proscribed by section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4) (1976), when, in January 1980, its members refused to handle cargo bound to and from the Soviet Union or carried on Russian ships. Appellant, who worked for a steamship agent, Moram Agencies, Inc. ("Moram"), claims that, as a consequence of the ILA boycott, Soviet ships ceased contracting with Moram, and that this in turn caused a substantial reduction in Moram's

---

* The Honorable Stanley S. Harris, United States District Judge for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. 29 U.S.C. § 187(b) (1976). Section 303(b) of the LMRA states that:

Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

*Id.* Subsection (a) makes it unlawful for any labor organization to engage in any activity defined as an unfair labor practice in § 8(b)(4) of

the National Labor Relations Act ("NLRA"). 29 U.S.C. § 187(a) (1976). Section 8(b)(4) provides, *inter alia,* that it shall be an unfair labor practice for a labor union to engage in, induce or encourage certain proscribed secondary activity (such as a secondary boycott). 29 U.S.C. § 158(b)(4)(B) (1976). For good scholarly treatments of secondary boycotts under the NLRA, see Goetz, *Secondary Boycotts and the LMRA: A Path Through the Swamp,* 19 U.Kan.L.Rev. 651 (1971); Lesnick, *The Gravamen of the Secondary Boycott,* 62 Colum.L.Rev. 1363 (1962); St. Antoine, *What Makes Secondary Boycotts Secondary?,* Southwestern Legal Foundation, 11th Annual Institute on Labor Law 5 (1965); St. Antoine, *Secondary Boycotts and Hot Cargo: A Study in Balance of Power,* 40 U.Det.L.J. 189 (1962).

business and a resulting termination of appellant and other employees whose services were no longer required. The District Court held that Charvet did not have standing to sue under section 303(b) and dismissed her claim. *Charvet v. International Longshoremen's Association*, No. 82–3160 (D.D.C. May 10, 1983). Because we agree that Charvet lacks standing to sue under section 303(b), we affirm the judgment of the District Court.

## I. BACKGROUND

In January of 1980, Charvet was employed by Moram Agencies, Inc., a steamship agent for Soviet ships traversing ocean ports in the United States. Moram's principal activity was to arrange for the transportation of goods on Soviet ships between foreign and United States ports. The company also arranged for the handling and transportation of goods in the United States by providing for their storage, shipping, stevedoring, customs clearance, insurance, cargo containers, and other commercial incidents of transportation in interstate commerce. As of January 1980, Moram employed approximately 300 persons in offices throughout the United States. Charvet was a Customer Service Manager in Moram's New Orleans office.

On January 9, 1980, the ILA ordered its members, who were longshoremen and other laborers employed in ports on the East and Gulf coasts of the United States and in Puerto Rico, to cease handling all Russian ships and cargoes to protest the Soviet invasion of Afghanistan. The ILA boycott was later found to be an illegal secondary boycott under section 8(b)(4) of the NLRA.[2] *See International Longshoremen's Association v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982); *International Longshoremen's Association v. NLRB*, 723 F.2d 963 (D.C.Cir. 1983).

As a result of the ILA's boycott and the consequent decline of Russian shipping activity in the United States, Moram drastically reduced its operations throughout the country. On February 4, 1980, less than a month after the commencement of the boycott, Charvet was dismissed from her job. Officials at Moram told Charvet that she was being fired because of the boycott. Moram subsequently released the remainder of its employees, and then went out of business entirely in April 1981.

Charvet filed a four-part complaint against the ILA on November 5, 1982, in the District Court for the District of Columbia. Count I of the complaint sought damages under section 303(b) of the LMRA for injuries sustained as a result of the union's illegal secondary boycott. Count II requested class certification on behalf of more than 250 similarly situated former Moram employees. Count III sought damages on the common law claim of tortious interference with contractual relationships, and Count IV sought punitive damages.[3]

The ILA filed a motion to dismiss Charvet's claims on December 20, 1982, claiming that her damages were too remote to be actionable under section 303(b). The District Court granted the motion on May 10, 1983, dismissing Charvet's federal claim with prejudice and dismissing the common law claim for lack of pendent jurisdiction without prejudice to its reassertion in a state or local court. This appeal followed.

## II. DISCUSSION

### A. *Introduction*

At first blush, it would appear from section 303(b) that anyone who is even remotely injured by reason of an unlawful secondary boycott has standing to sue for damages. This construction arguably follows from the broad language of the statute, indicating that "[w]hoever shall be injured

---

2. The ILA does not dispute the claim that it engaged in an illegal secondary boycott under § 8(b)(4) of the NLRA. It alleges only that appellant lacks standing under § 303(b) to recover damages for that unlawful activity.

3. Punitive damages may not be recovered in a § 303 suit. *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 260–61, 84 S.Ct. 1253, 1258–1259, 12 L.Ed.2d 280 (1964).

in his business or property ... may sue therefor ...." *See* note 1, *supra*. Every circuit considering the issue, however, has flatly rejected this limitless interpretation of standing under section 303(b). As was aptly noted in *Fulton v. Plumbers and Steamfitters*, 695 F.2d 402 (9th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983):

> Appellants argue that section 303 imposes no greater standing limitation than that imposed generally by article III of the United States Constitution. Relying principally on the statute's reference to "whoever", appellants maintain that any plaintiff suffering an actual loss or injury attributable to a union's violation of section 8(b)(4) has standing to pursue an action for damages under section 303.
>
> The expansive interpretation urged by appellants overlooks the section 303 requirement that the injury must occur "by reason of" a section 8(b)(4) violation. We conclude that the "by reason of" language imposes standing limitations. We are drawn to this conclusion by comparisons to the operative effect of similar statutory language in the antitrust field, our analysis of the statute's legislative history and by interpretations of section 303's standing requirements enunciated by courts in other circuits.

*Id.* at 405.[4]

The practical reasons justifying the view that section 303 imposes significant standing requirements are quite simple. Absent such requirements, "unlimited liability under § 303 might produce financial disaster for unions and inhibit the exercise of the right to strike ...." *W.J. Milner & Co. v. International Brotherhood of Electrical Workers, Local 349*, 476 F.2d 8, 12 (5th Cir.1973). In light of these considerations, it has been clear to the courts that "[t]he imposition of unlimited liability [under section 303] would tend to subvert our national labor policy." *Fulton*, 695 F.2d at 408. *See also United Mine Workers v. Osborne Mining Co.*, 279 F.2d 716, 729 (6th Cir.), *cert. denied*, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960).[5]

We concur fully in the view that section 303 does not allow for unlimited standing. We also categorically reject appellant's contention that, under a so-called "target area test," gleaned from antitrust law, "a plaintiff will have standing if he or she is 'within the area of the economy which [defendants] reasonably could have or did foresee would be endangered by the breakdown of competitive conditions.'" Appellant's Reply Brief, p. 3 (quoting *Fulton*, 695 F.2d at 407). As will be made clear in our discussion in part II.B., *infra*, we find that *Fulton* cannot reasonably be read as support for the standing test urged by appellant. In relying on *Fulton*, appellant fails to note that the court's judgment with respect to standing under section 303(b) is heavily influenced by its view that:

> The target area rule [in antitrust cases] confers standing if the plaintiff was within the target area of the defendant's illegal practices *and was not only "hit", but also "aimed at."*

*Fulton*, 695 F.2d at 407 (emphasis added). Appellant also fails to note the Ninth Circuit's specific reliance on the Supreme Court's decision in *Blue Shield v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73

---

4. Relevant portions of the legislative history of § 303(b) are thoughtfully analyzed in the *Fulton* opinion and in secondary sources *cited* therein. 695 F.2d at 405–06 & n. 5. We have fully considered these authorities in reaching our decision in this case.

5. Reflecting on these points, Judge Godbold, in a separate concurring statement in *Milner*, observed that:

> The courts have recognized that the phrase in § 303(b), "whoever shall be injured in his business or property,["] cannot refer to injury in a "cause in fact" sense, else, as was pointed out on the floor of Congress, the section might give a cause of action to millions of persons for the same union activity. Recognizing that some rational limiting standard was intended by Congress, the courts have sought to articulate such a standard.
>
> 476 F.2d at 13 (footnote omitted).

L.Ed.2d 149 (1982),[6] for the proposition that,

> a court must look to (1) the nexus between the injury and the statutory violation, and (2) the relationship of the injury alleged to the forms of injury that Congress sought to prevent or remedy by enacting the statute.

*Fulton*, 695 F.2d at 407. In short, we think that appellant can point to neither *Fulton* nor, as we shall demonstrate, any other court decision to support a claim of standing in this case.

### B. *The Existing Case Law Imposing Standing Requirements Under Section 303(b)*

The question presented in this case is one of first impression in this circuit. We do not, however, write on a clean slate with respect to the issue of standing under section 303(b). Although the circuits have employed slightly different formulations in establishing tests for standing, there are certain important premises and principles underlying most of the case law.

Recently, in *International Longshoremen's Association v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), the Supreme Court made it clear that an action will lie under section 303(b) when a union takes direct action against a neutral employer, for example, by refusing to handle the employer's goods, thus causing foreseeable injury to the neutral employer. The plaintiff, Allied International, was an importer of Soviet wood products and had contracts with an American shipper of the products from the Soviet Union to American ports. The shipper employed a stevedoring company to unload its ships. Following the Russian invasion of Afghanistan, ILA union employees working for the stevedoring company refused to handle cargo arriving from or destined for the Soviet Union. Among the goods boycotted was property belonging to Allied. The Supreme Court found that "the union was fully aware of the losses it was inflicting upon Allied. It [was] undisputed that Allied officials endeavored to persuade ILA leaders to allow it to fulfill its Russian contracts[,]" and, yet, the union still refused to handle Allied's property. 456 U.S. at 224, 102 S.Ct. at 1663. Under these circumstances, the Court found that "[b]y its exact terms the secondary boycott provisions of § 8(b)(4)(B) of the NLRA would appear to be aimed precisely at the sort of activity alleged in this case." *Id.* at 218, 102 S.Ct. at 1660.[7] Indeed, the case was viewed as so clear-cut that no issue of standing was even raised or addressed by the Court.

In addition to the obvious principles recited in *Allied*, it is generally understood that an action under section 303(b) may be brought not only by a neutral or secondary employer, but by the primary employer as well. Primary employers have standing to sue under section 303(b) because they are the direct objects of the union's unlawful activity. Harm to the primary is therefore not only foreseeable, but intentional. *See Mead v. Retail Clerks International Association, Local Union No. 839*, 523 F.2d 1371, 1375 n. 5 (9th Cir.1975) (primary employer may bring suit under section 303(b); *United Brick & Clay Workers v. Deena Artware, Inc.*, 198 F.2d 637, 643–44 (6th Cir.) (same), *cert. denied*, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952); *Jaden Electric v. International Brotherhood of Electrical Workers*, 508 F.Supp. 983, 986 (D.N.J.1981) (same). There is some authority for the proposition that even the *employees* of a primary employer may be permitted to

---

**6.** *Blue Shield* is discussed in part II.C., *infra*. The Court's decision construes the standing requirements of § 4 of the Clayton Act, 15 U.S.C. § 15(a) (1982), which provides a civil remedy for violations of the federal antitrust laws.

**7.** Allied alleged that, "by inducing members of the union to refuse to handle Russian cargoes, the ILA boycott was designed to force Allied [the shipper and the stevedoring company] 'to cease doing business' with one another and 'to cease using, selling, handling, transporting, or otherwise dealing in' Russian products," within the proscription of § 8(b)(4). 456 U.S. at 219, 102 S.Ct. at 1661.

recover damages under section 303, at least when the employees are found to be the direct object of a secondary boycott. *See, e.g., Wells v. International Union of Operating Engineers, Local 181*, 303 F.2d 73 (6th Cir.1962). *But see Fulton v. Plumbers and Steamfitters*, 695 F.2d 402 (9th Cir.1982) (employees of competing unions at a construction job site had no standing to sue for damages resulting from a loss of work due to an employer's decision to suspend operations in the face of a strike and boycott by other unions), *cert. denied,* — U.S. —, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983).

The most troublesome standing issues under section 303(b) arise in the connection with third parties, such as Charvet, who are injured indirectly by a union's actions against either a neutral or primary employer. The first important case dealing with third party standing was *United Mine Workers v. Osborne Mining Co.*, 279 F.2d 716 (6th Cir.), *cert. denied,* 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960). In *Osborne*, the defendant union had exerted unlawful secondary pressure on neutral employers to cause them to cease mining and transporting coal for Osborne. The plaintiff was a corporation engaged as a coal sales agency, selling coal on commission for Osborne. When Osborne was injured as a result of the union's secondary actions, the sales agency brought suit against the union under section 303(b) for the sales commissions it would have earned under its contract to sell the primary's coal. The court held that the sales agency had no standing to sue because its damage was "incidental and too remote for recovery under federal law." *Id.* at 729. In other words, even though the sales agency suffered arguably foreseeable harm, it had no standing because there was no direct action by the union against the agency.

In another Sixth Circuit opinion handed down shortly after *Osborne*, the court ruled that a plaintiff would have standing to sue (1) where the plaintiff and primary were engaged in a closely integrated business and the plaintiff "was a principal and not an agent" of the primary employer; or (2) where the plaintiff's physical property has been damaged by direct action of the union. *Gilchrist v. United Mine Workers*, 290 F.2d 36, 39 (6th Cir.1961). Although *Gilchrist* seeks to distinguish *Osborne*, presumably to allow for some third party suits under section 303(b), the opinion in *Gilchrist* in no way purports to abandon the "remoteness" test of *Osborne*.

Some confusion was added to the case law on third party standing with the issuance of the decision in *W.J. Milner & Co. v. International Brotherhood of Electrical Workers, Local 349*, 476 F.2d 8 (5th Cir.1973). The facts in *Milner* are very similar to those in *Osborne*. In the former case, the court found a cause of action to be stated by an exclusive area sales agent of the primary employer because it was "reasonably foreseeable" by the unions that a drop in sales to boycotted neutral contractors would adversely affect both the sales agent and the primary employer. *Id.* at 12. To reach this conclusion, the court made the following pertinent observations:

> Though the union's boycott in this case was intended ultimately to bring pressure to bear only upon [the primary employer], Milner was directly in its line of fire. Milner, in effect, was the sales arm of [the primary] in the peninsular Florida area. In that market, the financial fortunes of the two companies were closely intertwined. From the union's point of view, in order to be effective against [the primary], Milner would have to be hindered or prevented from selling [the primary's] products to its South Florida customers.

*Id.*

It is not clear whether the court in *Milner* intended to focus principally on a "reasonably foreseeable" test to allow third party standing, or on the particular facts of the case showing that the plaintiff and the primary employer "were closely intertwined." It is plain, however, that *Milner* intends to recognize some third party standing under section 303(b). On this

point, relying on a three-factor test, the majority opinion notes that

> it is clear that a third party can recover damages under § 303 if he can establish the existence of some combination of the following circumstances: (1) an integrated business enterprise which includes the third party and either the primary or the neutral employer; (2) direct injury to the third party's property; and (3) a principal-agent relationship between the third party and the primary employer. Even though we are unable to say that the instant case fits precisely within any of these circumstances, it does not follow that Milner is precluded from recovering damages against the unions under § 303.

*Milner*, 476 F.2d at 11–12.

The majority opinion in *Milner* criticizes *Osborne* as being too "vague," *id.* at 12, obviously concerned that *Osborne* may be read to foreclose all third party standing. However, in a separate concurring statement, Judge Godbold criticizes the majority opinion in *Milner* because he is "unable to understand what standard is being proposed." *Id.* at 13.[8] We share certain of the confusion expressed by Judge Godbold. Indeed, we are not even sure that the result in *Milner* is consistent with the three-factor test that the court purports to follow.

The recent decision of the First Circuit in *Abreen Corp. v. Laborers' International Union*, 709 F.2d 748 (1st Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984), highlights the obscurity of the test in *Milner*. In *Abreen*, the plaintiffs were owners of a construction site picketed by the defendant union. The primary target of the union's activity was a subcontractor working at the jobsite. The court held that the plaintiffs had standing under section 303(b) because they owned the property and because "illegal picketing which adversely affected [the general contractor] reasonably could be foreseen to

adversely affect" the owners. *Id.* at 753. Although the court in *Abreen* cites the three-factor test from *Milner*, it gives no meaningful clues as to how the factors have been weighed. Possibly in recognition of this deficiency, the court relies on an *alternative* holding:

> [W]here a third party is the owner of property allegedly injured by illegal secondary activity, this is a sufficient basis for bringing suit under section 303. In this case, ... [the plaintiffs] were the owners of the construction site. Further, it was alleged that the object of [the union's] picketing was to impede construction at the site. We hold, therefore, that the owners of a construction site who allege that they were directly injured by illegal secondary picketing, have standing to sue under section 303.

*Id.* at 753–54 (citations omitted) (footnote omitted). Although the First Circuit does not purport to rely on *Gilchrist*, its alternative holding is arguably similar to the judgment of the Sixth Circuit in *Gilchrist*, 290 F.2d at 39.

Despite the fact that *Milner* is somewhat obtuse in its meaning, and that *Abreen* is rendered somewhat ambiguous by its alternative holding, nevertheless both cases adhere to the view that there can be no limitless standing under section 303(b). At a minimum, both decisions require some action by the union against the plaintiff (either by virtue of some direct action aimed at the plaintiff, or damage to plaintiff's property, or an intertwined business relationship between plaintiff and the primary or neutral employer), and some plainly foreseeable injury to the plaintiff that is a byproduct of the defendant's unlawful action. To this extent, *Milner* and *Abreen* are wholly consistent with *Osborne*. There are only two conceivable, important differences between these cases: one is the possible suggestion in *Osborne* that there can

---

**8.** Judge Godbold goes on to observe that:

> The majority opinion mentions "line of fire," foreseeability of consequences, and threatening or undermining legitimate union interests. Because I am unable to perceive with assurance what is the test of § 303(b) liability proposed in the majority opinion I must, and do, concur only in the result.

*Milner*, 476 F.2d at 14 (footnotes omitted).

never be third party standing under section 303(b)—a suggestion at least implicitly rejected or modified in *Gilchrist;* the other is the possible suggestion of an unlimited "foreseeability" test in *Milner*—a suggestion at least implicitly refuted by the three-factor analysis outlined in the same opinion.

The final third-party standing case worth mentioning at this juncture is the Ninth Circuit's opinion in *Fulton v. Plumbers and Steamfitters,* 695 F.2d 402 (9th Cir. 1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983). In *Fulton,* the third parties suing under section 303(b) were employees of the primary employer. The union in *Fulton* tried to force the primary employer to reassign work from members of other unions to its own members. Instead of acceding to this union pressure, the employer suspended operations for ten days. As a result of the temporary shutdown, all of the employees lost ten days' wages. The court held that the employees lacked standing to sue under section 303(b) because their layoff was "not a 'necessary and integral' aspect of the section 8(b)(4)(D) violation." *Id.* at 407. In other words, the court in *Fulton* held that the primary employer's decision to lay off its workers for ten days was neither an intended nor a plainly foreseeable result of the union's illegal activity. The holding in *Fulton* can thus easily be harmonized with what we perceive to be the prevailing case law: there was no standing in *Fulton* because the union took no action against the employees, caused them no plainly foreseeable harm, and did no harm to the employees as a means by which it sought to pressure the primary employer into reassigning work to union members.

Contrary to appellant's assertion, *Fulton* surely does not support any broad view of

standing under section 303(b) based on some loose notion of the "target area rule." [9] Rather, the decision in *Fulton* is very much in the mold of the Sixth Circuit's opinion in *Osborne.* This is best reflected by the Ninth Circuit's reliance on considerations of remoteness to deny plaintiffs' standing to sue:

> The injury alleged is too remote from the alleged violation to warrant section 303 standing. Thus, the required nexus between the injury and the section 8(b)(4)(D) violation has not been established.
>
> . . . .
>
> The avowed purpose of the National Labor Relations Act is the promotion of industrial peace by the creation of stable collective bargaining relationships. 29 U.S.C. § 151 (1973). The imposition of unlimited liability would tend to subvert our national labor policy. If employees of an injured concern are permitted to sue, unions would become subject to liability to a potentially huge class of plaintiffs. The plaintiffs in this case sought to represent a class of nearly 1800 employees. The resultant financial burden may have a destabilizing effect upon the union and render it incapable of effective representation. Moreover, the threat of such liability may inhibit legitimate union activity, frustrating the exercise of rights granted by the National Labor Relations Act.

*Fulton,* 695 F.2d at 407–08.

In conclusion, we think that, whatever differences may be discerned in the foregoing judicial formulations of standing tests under section 303(b), appellants cannot satisfy any of the tests that have been enunciated by our sister circuits. Even assuming the legitimacy of third-party standing under section 303(b),[10] there is no showing in

---

9. We have briefly discussed the "target area rule" in part II.A., *supra.*

10. In attempting to analyze the decision in *Milner,* one noted authority has observed that "it might well be appropriate to accord a cause of action under [§ 303(b)] to third persons whose business relationship with the primary or secondary employer is direct and customary in the trade." R. GORMAN, BASIC TEXT ON LABOR LAW 292 (1976). In light of the test that we have enunciated for standing under § 303(b), *see* part II.D., *infra,* we find it unnecessary to give any special treatment to so-called "third party" plaintiffs. We frankly view *third-party standing* as a bogus issue.

this case of any action against plaintiff; there is no showing that plaintiff was engaged in a closely integrated business relationship with a neutral or primary employer against whom the union had taken unlawful secondary action; there is no showing of intended damage to plaintiff's physical property; there is no showing of any reasonably foreseeable injury to the appellant; and there is no showing that appellant's termination was an integral aspect of the union's unlawful secondary action.

## C. Analogies to Federal Antitrust Law

In analyzing standing to sue under section 303(b), several opinions have looked to judicial constructions of section 4 of the Clayton Act, which provides a civil remedy for violations of the federal antitrust laws. 15 U.S.C. § 15(a) (1982).[11] *See Fulton,* 695 F.2d at 405–08; *Osborne,* 279 F.2d at 728–29. In particular, the court in *Fulton* explains at length the applicability of antitrust law, noting that:

> This conclusion follows not only from the similarity in the language of the two statutes but also from the legislative history of section 303. The legislative history surrounding the enactment of section 303 suggests that the similarity in language was intentional, and that Congress intended for courts to look to antitrust standing principles formulated under section 4 for guidance in interpreting the standing requirements embodied in section 303. Moreover, a majority of the courts that have examined standing under section 303 have adopted standards formulated under section 4 of the Clayton Act. *See* Comment, *Standing to Sue Under Section 303 of the Labor Management Relations Act,* 45 N.Y.U.L.Rev. 539, 546, 549–51 (1970); Case Note, 43 Cin.L.Rev. 212, 215–16 (1974). For example, in *United Mine Workers, Dist. 19*

*v. Osborne Mining Co.,* 279 F.2d 716 (6th Cir.), *cert. denied,* 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960), the Sixth Circuit borrowed the "direct/remote injury" test from the antitrust context and employed that standard to determine section 303 standing.

695 F.2d at 405–06 (footnotes omitted).

In light of the exhaustive treatment of this subject in *Fulton* (including references to the relevant portions of the legislative history of § 303(b)), we see no need to repeat the arguments supporting a conclusion "that we should look to the standing principles ... developed under section 4 of the Clayton Act for guidance in interpreting section 303's standing requirements." *Fulton,* 695 F.2d at 406. However, we emphasize, as did the court in *Fulton,* that

> [w]e are not obliged ... to follow blindly the results obtained in the antitrust context. Our application of the principles of standing developed under section 4 have been informed by the broad remedial policies the antitrust laws reflect and seek to serve. The regulatory scheme and objectives of the National Labor Relations Act are, however, fundamentally different from the scheme and purposes of the antitrust laws. Thus, while we may look to antitrust principles for general guidance, the policies reflected in the National Labor Relations Act must inform the standards' application under section 303. We proceed with this caveat in mind.

*Id.* at 406–07 (citation omitted).

The circuit courts have utilized many tests to determine standing under section 4 of the Clayton Act. *See Blue Shield v. McCready,* 457 U.S. 465, 476 n. 12, 102 S.Ct. 2540, 2547 n. 12, 73 L.Ed.2d 149 (1982) (describing the various approaches). However, the Supreme Court has thus far declined to evaluate the relative utility of

---

**11.** Section 4 of the Clayton Act provides, in pertinent part, that:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a) (1982).

these tests. *Id.* Nonetheless, the Court did shed some light on the issue with its recent decision in *Blue Shield.*[12]

In *Blue Shield* the Supreme Court held that an individual participant in a Blue Shield group health plan had standing to sue for an alleged antitrust violation when her claims for reimbursement of psychologists' fees were denied. The antitrust claim was based on Blue Shield's policy of reimbursing participants for psychiatrists' fees but not for comparable treatment by psychologists, unless the claims were billed through a physician. The Court first recognized that although the statute on its face contained very little restrictive language, previous cases had acknowledged limitations on standing to sue under section 4. One of those limitations was that some persons may suffer injuries too remote from an antitrust violation to be able to avail themselves of the section 4 remedy. On this point, the Court noted: "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* at 477, 102 S.Ct. at 2547. Because neither the language of section 4 nor its legislative history offered any guidance on the question whether a particular injury was too remote to confer standing, however, the Court devised its own test based on principles of proximate cause:

> [W]e look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

**12.** The Court described the issue as follows: Analytically distinct from the restrictions on the § 4 remedy ..., there is the conceptually more difficult question "of which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4."

*Id.* at 478, 102 S.Ct. at 2548. Applying this test to the facts of the case, the Court in *Blue Shield* held that the individual insurance subscribers had standing to sue under section 4. First, the Court found a direct nexus between the alleged violation and harm to the plaintiff:

> Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to [plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy.

*Id.* at 479, 102 S.Ct. at 2549. The Court then held that the second part of the test was satisfied because the harm to plaintiff fell "squarely within the area of congressional concern." *Id.* at 484, 102 S.Ct. at 2551 (footnote omitted).

Although we do not view *Blue Shield* as necessarily dispositive of the question posed in this case, we find the test employed and the result reached by the Court fully consistent with our judgment in this matter. In particular, we note that the "direct nexus" requirement, albeit employed under a variety of different labels, is one that routinely has been embraced by the courts in the context of suits arising under section 303(b). As will be noted shortly, this requirement is an integral part of the test that we announce today with the issuance of this opinion.

The main point of this brief foray into antitrust law is to seek assurance that our holding in this case is in no way foreclosed by relevant analyses in the cases construing an area of law that is admittedly analogous to that under section 303(b). We not only have found this assurance in *Fulton* and other federal appellate decisions, but we also believe that the Supreme Court's decision in *Blue Shield* is fully supportive

457 U.S. at 476, 102 S.Ct. at 2547 (quoting *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 728 n. 7, 97 S.Ct. 2061, 2065 n. 7, 52 L.Ed.2d 707 (1977)) (emphasis and brackets added by the Supreme Court).

of the approach that we have determined to follow. Having said this, however, we stress that this opinion is written solely to decide a question of standing under section 303(b). Nothing that we say should be viewed as determinative of standing questions that may arise in the context of federal antitrust law.

### D. The Applicable Test for Determining Standing Under Section 303(b) of the LMRA

■ Based upon all of the foregoing considerations, we hold that, in order to have standing to sue under section 303(b), *there must have been some action*[13] *by the defendant union against the plaintiff (or immediately affecting the plaintiff's property), which caused reasonably foreseeable injury to the plaintiff, and was a means by which the defendant sought to achieve an unlawful end.* Under this test, we mean to make it clear that a plaintiff as in *Milner* would have *no* standing to sue under section 303(b). We also mean to say that "employees," as in *Fulton*, would have no standing to sue.

We believe that this test addresses all of the important concerns raised by the existing case law and, indeed, embraces the predominant principles underlying the decisions from other circuits. The test purposely excludes any possible coverage of lawful concerted activity, and it attempts to circumvent artificial issues relating to so-called "third-party standing."[14] *See* note 10, *supra*. The test also seeks to avoid the problem of vagueness found in *Osborne*'s "remoteness" test, the obscurity of the three-factor analysis of *Milner* and the ambivalence of the alternative holdings of *Abreen*.

Several important policy considerations have influenced our formulation of this test. First, under appellant's literal reading of section 303(b), unions would be subject to limitless liability for any action later determined to violate section 8(b)(4) of the NLRA. In this case, for example, appellant argues that the ILA is liable for boycott-related injuries to anyone in the entire Russian shipping industry, including stevedoring companies, steamship agents, shipowners, and importers of Soviet goods. Liability would extend to all employees of those concerns as well. Going one step further, one would expect consumers who were forced to pay higher prices for Soviet goods because of the boycott to be able to sue for their injuries. In short, the potential liability is staggering. In this case alone, for example, appellant seeks to represent a class of 250 to 300 former Moram employees, demanding a total of $8.5 million in damages.

Second, as other decisions have noted, the prospect of unlimited liability might easily suppress substantial union activity, regardless of its legitimacy. As appellee's counsel correctly notes, the inhibition would be particularly acute in labor law areas related to primary/secondary activities, where principles of legal liability are very complex and often unclear. In addition to inhibiting legitimate union activity, the potential for limitless liability and its consequent financial drain on a union treasury could seriously impair a union's ability to represent its members effectively. Such a result would thwart the fundamental purposes of our labor laws; this surely was not within the contemplation of Congress when it passed section 303.

---

**13.** "Action" includes "inaction," such as a refusal to handle the goods of a neutral employer.

**14.** We recognize that the test arguably may be read so as not to cover suits by *primary* employers (unless one assumes that a primary employer always is the direct object of unlawful secondary action). Although we have no occasion to decide this particular question today, we have no reason to doubt that, in appropriate circumstances, suits by primary employers are permis-

sible under § 303(b). *See Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839,* 523 F.2d 1371, 1375 n. 5 (9th Cir.1975) (primary employer may bring suit under § 303(b)); *United Brick & Clay Workers v. Deena Artware, Inc.,* 198 F.2d 637, 643–44 (6th Cir.) (same), *cert. denied,* 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952); *Jaden Electric v. International Bhd. of Elec. Workers,* 508 F.Supp. 983, 986 (D.N.J.1981) (same).

■ These considerations, and the others discussed above, require us to limit standing under section 303(b) so as to promote as fully as possible the dual congressional objectives of preserving legitimate union activity while protecting neutral parties from unlawful secondary activity. We believe that the test we adopt today satisfies those objectives and their underlying policy concerns.

### E. *Application of the Standing Test to the Facts of This Case*

■ In light of the test that we have enunciated, there can be little doubt about the result in this case. Appellant's claim must fail for lack of her standing to sue.

The appellant was an employee of a neutral employer. There is absolutely nothing in the record to suggest that the appellee directed any action at appellant or her co-workers at Moram. Furthermore, unlike the situation in *Allied,* the union took no action against Moram in pursuit of its boycott. In addition, it cannot possibly be found in this case that the incidental harm to the appellant was "reasonably foreseeable." To hold otherwise would mean that

*any harm* flowing from a secondary boycott is actionable so long as it could have been imagined ahead of time. We reject such a notion as patently absurd.[15] Finally, there was no action taken against the appellant (or even against her employer) which was "a means by which the defendant union sought to achieve an unlawful end." On this record, therefore, the District Court was fully justified in dismissing appellant's complaint with prejudice.

### III. CONCLUSION

Because we agree with the District Court's conclusion that Charvet lacks standing to sue under section 303(b) of the LMRA, we affirm the judgment of the District Court.

*So ordered.*

---

**15.** In no way can it be said that the ILA took any action against Charvet. She was at least several steps removed from the union's action: (1) union members refused to handle Soviet ships or cargo for their employers, the stevedoring companies; (2) the stevedoring companies were unable to fulfill their contracts with shippers to load and unload Soviet goods; (3) the Soviet Union ceased shipping to the United States; (4) Moram's business was curtailed; and (5) Charvet was fired by Moram. Any injury to Charvet was an indirect, incidental, albeit unfortunate, result of the ILA's boycott. She is not even close to satisfying the test that we have stated for standing to sue under section 303(b).