**ASSOCIATED IMPORTS, INC., Plaintiff,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, and T.W. Gleason in his capacity as President of International Longshoremen's Association, Defendants.**

**ASSOCIATED IMPORTS, INC., Plaintiff,**

v.

**LOCAL 1814, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Defendants.**

**Nos. 82 Civ. 8589–CSH, 83 Civ. 3529 (CSH).**

United States District Court, S.D. New York.

Jan. 28, 1988.

Zachary Starr, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff.

Ernest Matthews & Kevin Marrinan, Thomas W. Gleason, New York City, for defendants.

MEMORANDUM OPINION and ORDER

HAIGHT, District Judge.

In a Memorandum Opinion and Order reported at 609 F.Supp. 595 (S.D.N.Y. 1985) I granted plaintiff Associated Imports, Inc.'s ("Associated") motion for summary judgment on the issue of liability. My opinion relied on *International Longshoreman's Association v. Allied International*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), where the Supreme Court held that a Union's refusal to unload

ships from the Soviet Union constituted an illegal secondary boycott under § 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4).[1]

The defendant Union now moves pursuant to F.R.Civ.P. 60(b) to vacate the prior order and to grant summary judgment in its favor. The motion is based on the Union's contention that during discovery on damages it uncovered facts which conclusively show that Associated lacks standing to bring an action under § 8(b)(4) of the NLRA.

Specifically, the Union notes that ¶ 9 of the Complaint, which is clearly patterned after an allegation made by plaintiff in the *Allied* case, is demonstrably false. In that paragraph, Associated alleges that it directly negotiated a shipping contract for transportation of Soviet made glass with New York as its destination. Instead, the Soviet manufacturer of the glass arranged for its transportation to New York.[2]

Furthermore, the Union contends that Associated did not own the glass on the ship, as the Soviet manufacturer was the consignee of the goods on the bill of lading. Moreover, the Union claims that Associated never paid for the glass.

### I.

Standing to bring an action under § 8(b)(4) of the NLRA is conferred by § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, which reads, in pertinent part:

(b) Whoever shall be injured in his business or property by reason of any violation of [29 U.S.C. § 158(b)(4)] ... may sue therefor in any district court of the United States ... or in any court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit. 29 U.S.C. § 187(b)

Courts have consistently held that this statutory language does not confer standing on plaintiffs who have suffered only remote or derivative injury as a result of a secondary boycott. *See Charvet v. International Longshoreman's Association,* 736 F.2d 1572 (D.C.Cir.1984) and cases cited therein.

*Charvet* arose out of the same nationwide boycott of ships transporting goods from the Soviet Union as *Allied* and the instant case. In *Charvet*, a steamship agency employee laid off because her employer's business suffered as a result of the boycott sought to recover from the boycotting union. Summarizing caselaw on the point, the *Charvet* court held that in order to have standing under § 303

There must have been some action by the defendant union against the plaintiff (or immediately affecting the plaintiff's property), which caused reasonably foreseeable injury to the plaintiff, and was a means by which the defendant sought to achieve an unlawful end.

736 F.2d at 1582.

The court held that the steamship agency employee seeking to assert a claim lacked standing to do so under § 303 of the LMRA, noting that her injury was not a reasonably foreseeable consequence of the union's action, and that the union had not sought to achieve an unlawful end by means of her injury. Applying the standard enunciated in *Charvet* to the case at bar, I find that Associated has standing to pursue this action despite the evidence concerning shipping arrangements uncovered during discovery.

The Union relies on the fact that Associated played no part in arranging shipment of the glass from the Soviet Union. It characterizes Associated as a "stranger" to the transportation process, and concludes that Associated was "only a passive bystander awaiting delivery." Def. Reply Memo at 11.

---

1. A secondary boycott is an attempt by a union to induce its members to refuse to handle goods with the object of forcing entities with which it has no dispute to cease doing business with an entity with which the union has a dispute.

2. If this action had been brought subsequent to the 1983 amendments to F.R.Civ.P. 11, inclusion of ¶ 9 in the complaint would raise serious questions about plaintiff's counsel's compliance with the Rule's requirement of a reasonable factual inquiry.

Associated contends that it entered into a "C.I.F." contract with the Soviet agency who sold the glass.[3] Under a C.I.F. contract title to the goods passes to the buyer upon delivery of proper documents by the seller. Actual delivery of the goods is not required. In fact, "it has been said that a [C.I.F.] contract is one for the sale of documents relating to goods rather than a sale of goods," although that characterization is "perhaps unduly broad." *Warner Bros. & Co. v. Israel*, 101 F.2d 59 (2d Cir.1939). *See also* Comment 1 to U.C.C. § 2–320 (delivery to the carrier is delivery to the buyer for purposes of risk and "title.") Comment 16 to U.C.C. § 2–320 (title and risk of loss pass to buyer "on shipment"); *Petroleo Brasileiro, S.A., Petro v. Ameropan Oil Corp.*, 372 F.Supp. 503, 505 (E.D. N.Y.1974) (same).

In support of the contention that its contract with the Soviet glass manufacturer was a C.I.F. contract, Associated has submitted a joint affidavit from Leo and Muriel Zuckerberg, principals of Associated, and a copy of the contract at issue. The contract clearly states that it is "on terms C.I.F." The Zuckerbergs jointly aver that the contract of sale was a C.I.F. contract and that the Soviet seller performed all its obligations under the contract.

The Union contends that the "exact nature of Associated's interest in the cargo is at this point very much unresolved." Def. Reply at 3. The Union notes that Associated never paid for the glass; that Associated was not the consignee of the glass on the cargo documents; and that Associated has no knowledge regarding the fate of the glass after the Union refused to unload it. Together, these undisputed facts lead the Union to conclude that Associated was not the owner of the glass.

Nevertheless, the Union also contends that even if Associated legitimately held the ownership interest created by a C.I.F. contract in the buyer after the seller has performed its obligations, Associated would still lack standing under § 303. They argue that "mere title to the goods, or other incidents of ownership, are not sufficient to accord standing on Associated as a participant in the secondary boycott, and they in no way establish the kind of nexus with the boycott that the courts have required before conferring standing on third parties." Def. Reply Memo at 7–8 (emphasis added).

II.

 The issues before me on the present motion are twofold. First, if the facts are as Associated contends, i.e. that it entered into a standard C.I.F. contract and that the seller had performed all its obligations thereunder, does § 303 confer standing on Associated? Second, do the questions raised by the Union indicate factual disputes making the entry of summary judgment inappropriate at this time?

---

3. A C.I.F. contract is defined in the Uniform Commercial Code in the following terms:
(1) The term C.I.F. means that the price includes in a lump sum the costs of the goods and the insurance and freight to the named destination. The term C. &. F. or C.F. means that the price so includes cost and freight to the named destination.
(2) Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to
(a) put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination; and
(b) load the goods and obtain a receipt from the carrier (which may be contained in the bill of lading) showing that the freight has been paid or provided for; and
(c) obtain a policy or certificate of insurance ...; and
(d) prepare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract; and
(e) forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights.
\* \* \* \* \* \*
(4) Under the term C.I.F. ... unless otherwise agreed the buyer must make payment against tender of the required documents and the seller may not tender nor the buyer demand delivery of the goods in substitution for the documents.
U.C.C. § 2–320

The Union argues that the key factual distinction between Associated and the plaintiff in *Allied* is that in *Allied* the plaintiff negotiated directly with a shipping company to arrange transportation of its imported goods. "In this case, we have plaintiff's own word that Associated had nothing to do with the contract of carriage. At best Associated might have been the endorsee of the consignee. Prudential [the shipping line] and the stevedore [who hired the longshoremen to fulfill its contract to unload Prudential's ship] ... never did business with Associated.... Plaintiff admits it was ... only a passive bystander awaiting delivery." Def. Reply Memo at 11.

In the terms of the test enunciated in *Charvet, supra,* the Union is arguing that although the union's action immediately affected the plaintiff's property thereby causing reasonably foreseeable injury to the plaintiff, the injury to plaintiff was not a means by which the defendant sought to achieve an unlawful end. *See* 736 F.2d at 1582. Instead, the Union illegally sought to influence the shipping company and the stevedore not to participate in the transportation of Soviet goods. Since Associated was not a party to the transportation contract, the union concludes that Associated lacks standing under § 303. I do not agree.

I think it evident that one purpose of the boycott was to coerce businesses such as Allied or Associated not to engage in commerce with the Soviet Union.[4] Furthermore, the distinction between the positions of Associated and Allied vis-a-vis the transportation process is eroded by the undisputed fact that Allied never contracted with the shipping company for the transportation of the goods at issue in that case.

Instead, the Allied goods were transported pursuant to a contract negotiated and signed by a Soviet agency, acting on Allied's behalf. *See* Def. Reply Memo at 16.

The only difference between the case at bar and *Allied* is that in *Allied* the buyer chose to take delivery of the goods in the Soviet Union and to employ a Soviet agency to arrange for their transportation to the U.S. In the case at bar, the buyer chose instead to deal only with one Soviet entity, and to make that entity responsible for shipping the goods to the U.S. The distinctions between these two situations pale when compared to their similarities. In both cases the goods were transported from the Soviet Union under contracts negotiated by Soviet entities, and were to be delivered to American entities relying on the efforts of their Soviet counterparts.

Accordingly, I hold that Associated has met the test enunciated in *Charvet* and thus has standing under § 303 to pursue its claim in this case.

Furthermore, I reject the Union's suggestion that the factual questions it raises about title, risk of loss, and other incidents of ownership necessitate an order vacating the summary judgment in this case. Although the Union contests Associated's view of the ownership interest held by Associated in the glass, it relies solely on ambiguous statements made in depositions of the Zuckerbergs. These ambiguous statements, clarified by the Zuckerbergs' joint affidavit submitted on the present motion, are not sufficient to demonstrate that the material issue of ownership is in genuine dispute. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984) (speculation and conjecture insufficient to defeat summary judgment).[5]

---

4. The Union's reliance on the holding of the Fifth Circuit in *Baldovin v. International Longshoremen's Association,* 626 F.2d 445, 452 (5th Cir.1980) ("while the ILA refusal to work has affected American farmers who produce the grain, American transportation companies who move it to ports and the American stevedores who load it aboard vessels, it is patent that this was an incidental effect and not the objective") is unpersuasive in light of the Supreme Court's subsequent holding in *Allied, supra,* 456 U.S. at 224, 102 S.Ct. at 1663–64 ("when a purely sec-

ondary boycott 'reasonably can be expected to threaten neutral parties with ruin or substantial loss' ... the pressure on secondary parties must be viewed as at least one of the objects of the boycott or the statutory prohibition would be rendered meaningless") (citation and footnote omitted).

5. Even if, as the Union contends, Associated never paid for the glass and had no participation in its disposal after the Union's illegal refusal to unload it, there is no evidentiary basis

The Union may pursue its questions regarding ownership of the glass in discovery, and may renew its motion if so advised after the factual predicate is developed.

## III.

 The Union argues that Associated's lack of standing under § 303 is manifest in Associated's interrogatory response itemizing damages. "Nowhere [in that response] ... is there a claim directly to the cargo [which the Union refused to unload] ... Thus, the happenstance that plaintiff may or may not have had title to the one isolated shipment ... plays no part in the recovery plaintiff claims standing to pursue." Def. Reply Memo at 29–30.

I do not believe that the scope of what plaintiff seeks to recover bears directly on the threshold question of whether standing to assert a claim for damage arising out of the illegal boycott at issue. Instead, it seems to me that the scope of the relief sought is more appropriately analyzed in terms of speculative or consequential damages. The harm suffered by plaintiff and for which defendant is liable is that arising directly out of the illegal refusal to unload the glass plaintiff was importing from the Soviet Union. The damage thus caused by the Union's action is neither more nor less than if the Soviet seller had breached its contract by refusing to deliver the goods.

Regardless of which analytic rubric leads to the result, however, I agree with the underlying premise of the Union's argument: that Associated cannot recover for loss of profits from Soviet trade in perpetuity when those losses are purely speculative.[6] Familiar principles of contract law would limit the damages recoverable if the Soviet seller had failed to deliver the goods. I see no reason why those principles should not apply by analogy to the instant situation.

Having indicated my views on the scope of recoverable damages, I should make it clear that I do not make a determinative ruling on the point at this stage in the proceedings. Associated has not responded to the arguments regarding the scope of damages raised in the Union's Reply Memorandum, and thus my views on the question have been developed without the assistance of counsel for Associated. If the Union wishes to preclude Associated from introducing evidence of damages which it believes are non-recoverable, the Union may bring an appropriate motion seeking such an order.

## IV.

Associated moves for an order awarding it attorneys' fees incurred as a result of the Union's motion to vacate the entry of summary judgment as a sanction under F.R.Civ.P. 11. I deny the motion. While I reject the Union's arguments regarding Associated's standing under § 303, those arguments were well grounded in existing law or in good faith arguments for the extension or modification of existing law. In such circumstances, Rule 11 sanctions are inappropriate.

*Conclusion*

Defendants' motion to vacate the entry of summary judgment on the issue of liability is denied.

Plaintiff's motion for sanctions is denied.

The parties are directed to engage in a good faith attempt to reach a settlement on the question of damages, failing which they are to appear at a status conference in Courtroom 307 at 3:30 p.m. on March 4, 1988.

The foregoing is So Ordered.

---

to doubt that the contract was on C.I.F. terms. A C.I.F. buyer may make whatever subsequent commercial arrangements it wishes, which may affect the buyer's right to damages, but do not impinge on Associated's standing to sue under the Act.

**6.** The standing test enunciated in *Charvet* speaks implicitly of limits on speculative damages in actions under § 303 when it refers to "reasonably forseeable" injury.