**W. J. MILNER AND CO. OF FLORIDA,**
Plaintiff-Appellant,

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 349, et al., Defendants-Appellees.**

No. 72-2120.

United States Court of Appeals,
Fifth Circuit.

March 21, 1973.

Albert E. Phillips, J. Alex Porter, Atlanta, Ga., Peter C. Jones, Miami, Fla., for plaintiff-appellant.

Seymour Gopman, North Miami Beach, Fla., Kaplan, Dorsey, Sicking & Rodenberg, Joseph H. Kaplan, Miami, Fla., Thomas J. Pilacek, North Miami Beach, Fla., Robert A. Sugarman, Miami, Fla., for defendants-appellees.

Before GEWIN, BELL and GODBOLD, Circuit Judges.

GEWIN, Circuit Judge:

In the district court, W. J. Milner and Company brought separate actions against three labor unions[1] pursuant to § 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b),[2] seeking recovery for damages incurred by reason of their allegedly unlawful secondary boycott activities. There appears to be no dispute about the fact that the conduct of the unions was unlawful. After hearing oral argument, the court, D.C., 341 F.Supp. 151, granted the union's motion for summary judgment and dismissed Milner's claims with prejudice on the ground that Milner did not have a federal cause of action under § 303(b). We reverse.

The pertinent facts in this case can be stated briefly. W. J. Milner and Company is engaged in the business of selling electrical supplies on a commission basis to distributors and wholesale outlets in the state of Florida. A substantial portion of Milner's business[3] is derived from a contractual arrangement under which it has the exclusive right in the peninsular Florida area to sell the building wire products manufactured by Southwire Company of Carrollton, Georgia. In its complaint, Milner alleged that during the three years prior to the instigation of this action, the defendant unions exerted unlawful secondary pressure against a number of South Florida electrical contractors seeking to persuade or induce them not to use Southwire's building wire products on their job sites. As a result of these activities, damages were claimed by Milner for loss of commissions in the amount of $201,588.00.

Milner contends that the district court's denial of a right of recovery on the basis of United Mine Workers v. Osborne Mining Co., 279 F.2d 716 (6th Cir. 1960) was improper. This argument rests on legislative history and post-*Osborne* decisions construing § 303(b) which are said to recognize a broader concept of standing than that adopted in *Osborne*. Milner urges that standing should be extended to those persons whose business or property is so closely related to the product, which is the subject of the boycott activity, that it is reasonably foreseeable that such business or property will be injured thereby. The unions, on the other hand, assert that the *Osborne* decision is still viable; that it was approved by this circuit in Abbott v. Local Union No. 142, 429 F.2d 786 (5th Cir. 1970) and that it was properly held by the district court

---

1. The three unions are Locals 323, 349 and 728 of International Brotherhood of Electrical Workers.

2. 29 U.S.C. § 187(b) provides:
   Whoever shall be injured in his business or property by reason or (sic) any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185

   of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost for the suit.

3. During the three years prior to this suit, the proportion of Milner's sales attributable to Southwire products was 74%, 79% and 81% respectively.

to be dispositive of the instant case. Rejecting Milner's forseeability test as overbroad, they maintain that standing under § 303(b) has been consistently limited either to the actual objects of the secondary boycott or to persons whose interests are inseparably identified with those of the actual objects by virtue of a financial or controlling relationship.

In order to resolve this issue, we must fathom some meaning from the broad wording of § 303(b) which confers a right of action upon persons injured in their business or property by reason of a secondary boycott. While not commanded by a literal reading of the statute, our analysis in this case proceeds upon the general premise, suggested in the legislative history and adopted by a number of courts, that Congress intended to create some limitation on standing to sue under § 303(b). Therefore, what we must decide in the instant case is where this limitation begins. Although neutral and primary employers have been granted standing to sue under § 303(b), the right to sue of third parties who are neither neutrals nor primaries has never been clearly articulated.

The seminal case interpreting § 303 is United Brick & Clay Workers v. Deena Artware, 198 F.2d 637 (6th Cir. 1952), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694. The relevance of that decision to the case at hand lies not in its recognition of a right of recovery under § 303 for primary as well as neutral employers, but rather in the court's explanation of its holding. In flatly rejecting the union's position that this section protected only innocent third party employers (neutrals), the court pointed out § 303's broad language and suggested that if Congress had intended to limit recovery thereunder, it could easily have done so.

Almost a decade later, the Sixth Circuit was presented with the issue not before the court in *Deena Artware*: whether a person who was neither a pri-

mary nor a neutral employer could recover under § 303. In United Mine Workers v. Osborne Mining Company, 279 F.2d 716 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960), this question was answered in the negative. There one of the plaintiffs, Love & Amos Coal Company, was a coal sales agency under contract with the primary employer in the labor dispute to sell its coal on a commission basis. Love & Amos claimed damages against the union for the commissions it would otherwise have received had the illegal secondary boycott activity not caused a reduction in the primary employer's coal productivity. Although Love & Amos contended that some of the union's illegal activities were directed at it and not solely at the primary employer, the court found that recovery was not sought on this theory. It observed that Love & Amos' cause of action instead was based upon the destruction of the primary employer's business and that the damages claimed to have been suffered arose solely from the contractual relationships with the primary employer. In denying Love & Amos' standing to sue, the court held that the damages alleged were incidental and too remote for recovery under federal law. United Mine Workers v. Osborne Mining Co., 279 F.2d 716, at 729.

After *Osborne*, several cases were decided recognizing a cause of action under § 303 in favor of third party plaintiffs who were neither the neutral nor primary objects of secondary boycott activity. In Gilchrist v. United Mine Workers, 290 F.2d 36 (6th Cir. 1961), the third party was a partnership which had been engaged in the mining and sale of coal for a number of years. It had a close relationship with the primary object of the secondary boycott, G. & R. Coal Company, a closed corporation whose principal officers, directors and shareholders were also members of the partnership. They were parties to a contract under which the partnership agreed to furnish certain coal mining land and mining equipment to the coal

company. In return, the coal company agreed to stripmine the coal and load it for shipment and ultimate sale by the partnership. In determining that the partnership had standing to sue, under § 303, the court went to some lengths to distinguish *Osborne*. It found that the partnership had an integrated coal business in which the actual mining was delegated to an instrumentality (G. & R. Coal Company) controlled entirely by partnership members. This was thought to give the partnership the status of a principal and not an agent as was true of the third party in *Osborne*. The court further noted that the partnership's physical property was damaged and that its coal business was disrupted and destroyed. The damages sustained thereby were deemed to be direct and not remote or incidental as in *Osborne* where the damage sought arose solely as a consequence of the destruction of the primary employer's business.

It was evident at this point that § 303's broad language was not going to be carried to its literal limits to confer a cause of action upon all persons suffering damage as a result of secondary boycott activity. Yet, it was still somewhat unclear from *Gilchrist* which considerations were essential to its limitation of *Osborne* and a recognition of standing to sue: the integrated character of the partnership's business enterprise or the directness of the physical injury to its property. An answer to this question was hinted in Wells v. International Union of Operating Engineers, Local 181, 303 F.2d 73 (6th Cir. 1962) where the employees of a primary employer were permitted to recover damages under § 303. Although the court failed to give adequate explanation for this conclusion, it is implied from the opinion that these employees were considered to be the object of the secondary boycott just as much as the primary employer was because they were the very individuals sought to be organized by the union. Thus, even though these employees received damages based on their contrac-

tual relationship with the primary employer, this decision in light of *Gilchrist's* direct injury test did not come into conflict with the *Osborne* rationale.

Pennsylvania Railroad Co. v. National Maritime Union, 206 F.Supp. 797 (E.D. Pa.1962) was another decision in the series of cases dealing with standing under § 303 to embrace the *Gilchrist* line of reasoning. The third party there, Pennsylvania Railroad, owned certain dockside ore unloading facilities which it leased to Tidewater Company, the neutral employer as far as the secondary boycott activity was concerned. The railroad claimed damages against the union because the boycott resulted in the loss of certain payments in the nature of a commission it was entitled to receive under the agreement with Tidewater. The district court denied the union's motion to dismiss. It held that *Osborne* was not controlling because the railroad owned the unloading facilities where the secondary activity took place. The union's conduct, therefore, represented a direct interference with the railroad's business and property. The court apparently did not consider it significant that the railroad and Tidewater Company were not part of an integrated business enterprise.

The only Fifth Circuit case which has dealt with the issue now before this court is Abbott v. Local Union No. 142, 429 F.2d 786 (5th Cir. 1970) which recognized a cause of action under § 303 in favor of the organizer and manager of a corporation in his individual capacity. Comparing the case to *Gilchrist* because of its factual similarities, the court concluded that the plaintiff was in effect the alter ego of the corporation he formed and thus was entitled to recover damages suffered as a result of the secondary boycott activity. Once again the *Osborne* decision was limited to its own peculiar facts.

From the preceding discussion, it is clear that a third party can recover damages under § 303 if he can establish

the existence of some combination of the following circumstances: (1) an integrated business enterprise which includes the third party and either the primary or the neutral employer; (2) direct injury to the third party's property; and (3) a principal-agent relationship between the third party and the primary employer. Even though we are unable to say that the instant case fits precisely within any of these circumstances, it does not follow that Milner is precluded from recovering damages against the unions under § 303.

There are several reasons for our conclusion in this regard. First, in our opinion, the *Gilchrist* line of cases does not enumerate an *exclusive* set of circumstances under which a third party has a cause of action under § 303. Those circumstances were brought to light primarily to distinguish *Osborne* and to circumvent the vague remoteness of injury test which *Osborne* recognized as setting an outer limit on the right of third parties to recover. Second, even if *Osborne* is conceded to be factually analogous to this case, we do not think that the *Abbott* decision has committed this circuit to the *Osborne* rationale. Indeed, from our reading of *Abbott* the most that can be said is that this circuit has approved the restrictions placed on *Osborne* by the *Gilchrist* case. Third, Milner's right to recover under § 303 if it can prove the allegations of the complaint ultimately involves a policy determination. None of the decisions that we have discussed undertook a specific analysis of this issue in light of the purposes and policies of the Labor Management Relations Act. The deficiencies of *Osborne* and the *Gilchrist* line of cases in this connection makes them less persuasive than they might have been.

In determining whether Milner has a right to recover under § 303 the fundamental question in our estimation is whether such a result if followed in all similar situations would threaten or undermine legitimate union interests.

While we would readily agree that so-called unlimited liability under § 303 might produce financial disaster for unions and inhibit the exercise of the right to strike, we do not think that recognizing a right to recover in favor of Milner if supported by adequate proof raises the specter of such dire possibilities. Though the unions' boycott in this case was intended ultimately to bring pressure to bear only upon Southwire, Milner was directly in its line of fire. Milner, in effect, was the sales arm of Southwire in the peninsular Florida area. In that market, the financial fortunes of the two companies were closely intertwined. From the union's point of view, in order to be effective against Southwire, Milner would have to be hindered or prevented from selling Southwire's products to its South Florida customers.

In our opinion, these consequences were reasonably foreseeable by the unions. Indeed, from what we can discern from the record, the unions had a full appreciation of the economic realities of the Milner-Southwire relationship. Their strategy appears to have been predicated entirely on the assumption that a decline in Milner's sales would eventually be felt by the primary object of the boycott, Southwire. The unions apparently accomplished what they set out to do. The damage suffered by Milner was the substantial equivalent of the result which would have been produced if Milner had been the primary object of the union's secondary activity. In light of these circumstances, which must be assessed on a case by case basis, it is our conclusion that on the precise facts alleged in this case the district court erred in dismissing Milner's claim for failure to state a federal cause of action.

We do not make the slightest intimation or suggestion as to how the case should be decided on the merits; we only hold that under the allegations of the complaint a dismissal was

inappropriate.[4] The plaintiff should be given an opportunity to prove its allegations and to fully develop all pertinent facts alleged in the complaint. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957); Equity Capital Co. v. Sponder, 414 F.2d 317 (5th Cir. 1969). The determination of these issues is the normal function of the district court. Accordingly, we reverse the judgment below and remand the case for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GODBOLD, Circuit Judge (specially concurring):

I concur in the result. The courts have recognized that the phrase in § 303(b), "whoever shall be injured in his business or property, cannot refer to injury in a "cause in fact" sense, else, as was pointed out on the floor of Congress,[1] the section might give a cause of action to millions of persons for the same union activity. Recognizing that some rational limiting standard was

intended by Congress, the courts have sought to articulate such a standard. *Osborne,*[2] *Gilchrist*[3] and *Pennsylvania R.R.*[4] have expressed a standard consisting of analysis of the existence of a nexus or relationship between the plaintiff and the primary object of the secondary boycott, in the form of contractual or business arrangements and of physical congruence of facilities.[5] The nexus was present in *Gilchrist* and sufficiently alleged in *Pennsylvania R.R.,* but not present in *Osborne.*

The relationship or nexus test is not entirely satisfactory as a rational limitation on "whoever." And at least some voices in Congress view with a jaundiced eye the efforts of the courts to prescribe a workable limitation.[6] The method of analysis of the Sixth Circuit cases and of *Pennsylvania R.R.* is not binding upon us,[7] and I have no objection to attempting to spell out for this circuit a standard more satisfactory than the "relationship" standard. The difficulty is that I am unable to understand what standard is being proposed.

4. Although the defendants moved for summary judgment on the basis that the plaintiff was not entitled to recover any damage, the court found it unnecessary to rule on such motion and concluded:

> [T]he Court finds that this plaintiff does not have a federal cause of action under the statutory sections which he has plead and further consideration of the defendants' Motion for Summary Judgment is not necessary.

Thereupon the court entered a final judgment dismissing the plaintiff's actions with prejudice.

1. 93 Cong.Rec. 4872–3 (1947) (remarks of Senator Morse).

2. U. M. W. v. Osborne Mining Co., 279 F.2d 716 (6th Cir. 1960).

3. Gilchrist v. U. M. W., 290 F.2d 36 (6th Cir. 1961).

4. Pennsylvania R. R. Co. v. National Maritime Union, 206 F.Supp. 741 (E.D.Va. 1961).

5. At times the cases have discussed whether plaintiff's damages were too remote or incidental. E. g., *Osborne,* 279 F.2d at 729. This is a statement of an ultimate conclusion, the reason for which is that

the precise relationship or nexus between the relevant parties, which the *Osborne* court had explored earlier in its opinion, *id.* at 727–728, is too far attenuated.

6. See 1959 U.S.Code Cong. & Adm.News pp. 2382–2383.

7. Abbott v. Local Union No. 142, 429 F.2d 786 (5th Cir. 1970) decided by this circuit, is a unique case of little assistance in our problem. The nexus or relationship between the prime contractor (Abbott, Inc.) and the subcontractor (Moore), operating at the same construction site, was such that the union did not contest on appeal the corporation's cause of action for damages but only the calculation of damages. It did, however, contest the right of the president, manager and alter ego of the corporation to damages suffered by him individually. The discussion of *Osborne* and *Gilchrist* did not concern the relationship between the neutral (Abbott, Inc.) and the primary employer (Moore) but the question of whether Abbott individually had such a close relationship to the corporation—in effect, he was the corporation, or stood in its shoes—that he was within the ambit of the relationship between Abbott, Inc. and the subcontractor.

The majority opinion mentions "line of fire," foreseeability of consequences,[8] and threatening or undermining legitimate union interests.[9]

Because I am unable to perceive with assurance what is the test of § 303(b) liability proposed in the majority opinion I must, and do, concur only in the result.

8. Foreseeability may define far too wide a scope of exposure to liability. Presumably a union would never engage in an illegal secondary boycott for no reason at all but only with the expectation that impact will occur. Thus it would be unusual for damage to occur in a cause in fact sense and yet not be reasonably foreseeable. Additionally, a foreseeability standard seems to me much broader than the "direct line of fire." While I am not certain of what is meant by the latter, I am inclined to think it is a much narrower gauge than the former.

9. A union might be subjected to a claim for $1,000 damages for illegal secondary activity, which it might survive, but could it be subjected to a claim by another person similarly situated for $1,000,000 damages, which might destroy the union or render it impotent to pursue its legitimate objectives? Or do dollars have any relevance?