793 F.2d 1201
 122 L.R.R.M. (BNA) 3240, 55 USLW 2072,
105 Lab.Cas. P 12,015,
21 Fed. R. Evid. Serv. 260
 Claude L. PRATER, LaRue Prater, Bill Prater, Mark Pirkle,
Sonja Mast, Robert Mast, Merle Yates, Leon Bowman,
Earle Hayes, Calvin Cogburn and Joe Bob
Warren, Plaintiffs-Appellants,
Oakman Mining Company and Prater Equipment Company,
Plaintiffs-Cross-Appellees,
v.
UNITED MINE WORKERS OF AMERICA, DISTRICTS 20 AND 23,
Defendants-Appellees, Cross-Appellants,
United Mine Workers of America, International Union,
Defendant-Appellee,
Arnold Miller, Charles Fuller, Tommy Gasten, Jerry McCoy,
Robert Webb, Alfred Key, Bobby Meyers, Jackie Carden, Thomas
Eugene Cook, Jack E. Robbins, Harold McLaughlin, J.W. Mann,
et al., Defendants-Appellees.
 No. 84-7751.
 United States Court of Appeals,
Eleventh Circuit.
 July 18, 1986.
 
 Edward L. Ramsey, Parker & Dawson, Birmingham, Ala., Michael E. Avakian, Center on National Labor Policy, Inc., North Springfield, Va., for Prater, et al.
 William E. Mitch, Cooper, Mitch & Crawford, Birmingham, Ala., for UMWA, Dist. 20.
 Robert H. Stropp, Jr., Birmingham, Ala., Earl V. Brown, Jr., Washington, D.C., for UMWA Intern. Union.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before GODBOLD, Chief Judge, JOHNSON, Circuit Judge, and TUTTLE, Senior Circuit Judge.
 GODBOLD, Chief Judge:
 
 
 1
 This suit is the result of events that occurred in Alabama during a nationwide coal strike and involving United Mine Workers of America (the International) and its affiliated District 20.
 
 
 2
 Oakman Mining Company is a non-union coal mining company that was leasing equipment from Prater Equipment Company at the time of the strike. During the strike union miners attempted to prevent non-union coal operations. On January 9, 1978 much of Prater's equipment was badly damaged by union miners. On February 2, 1978 a group of union miners armed with clubs and guns approached Oakman's work site and demanded that the workers cease mining coal. Oakman's employees retreated to a house near the mine. After a violent confrontation with the union miners, the Alabama Highway Patrol rescued Oakman's employees. Oakman and Prater ceased doing business after February 2, 1978 and until March of 1978 when the President of the United States issued a Taft-Hartley injunction.
 
 
 3
 Corporate plaintiffs Oakman and Prater and individual officers, owners, and employees of Oakman brought this suit alleging that (the International) and District 20 engaged in a secondary boycott in violation of Sec. 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 158(b)(4). Plaintiffs sought damages under Sec. 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 187. The amended complaint also includes pendent state claims for interference with economic relations, assault and battery, and false imprisonment.[1]
 
 
 4
 The district court granted defendants' motion for partial summary judgment and dismissed all claims brought by individual plaintiffs, holding that individual plaintiffs lacked standing to sue under Sec. 303 and that the court lacked pendent jurisdiction over individual plaintiffs' state claims. The district court empaneled an advisory jury on the question of liability of defendants to plaintiff corporations, with the understanding that if the court either with or without the advice of the jury should find liability, the same jury would immediately hear and decide the question of damages.
 
 
 5
 The jury responded to special interrogatories, finding that the International and District 20 had violated the LMRA secondary boycott provisions to the injury of both Oakman and Prater, the International had not tortiously interfered with the business of Oakman or of Prater, District 20 had tortiously interfered with the contracts and business of Oakman, and had tortiously interfered with the business of Prater. The jury found District 20 liable to Oakman for $313,651 (actual and punitive) and to Prater for $184,269 (actual and punitive) for violations of Sec. 303 and for pendent state torts and found the International liable to Oakman for $12,862 (actual) and to Prater for $14,911 (actual) for violations of Sec. 303 of the LMRA. The district court issued an opinion, stated findings of fact and conclusions of law, and adopted the findings of the jury. Judgment was entered accordingly.
 
 
 6
 The individual plaintiffs appealed, contending that the district court erred in denying them standing under Sec. 303 of the LMRA and in dismissing their pendent state claims. District 20 cross-appealed. It maintains that plaintiffs' asserted federal cause of action is barred by a six-month statute of limitations. It contends that the district court erred in finding it liable. Also, it questions evidentiary rulings and the jury charge on compensatory damages.
 
 
 7
 We affirm in part and reverse in part.
 
 
 8
 I. Section 303 standing.
 
 
 9
 Oakman's employees sought damages under Sec. 303 of the LMRA for loss of wages during the time that the union members' secondary boycott activity caused Oakman to cease its mining operations. The district court held that these employees lacked standing to sue.
 
 
 10
 Section 303 confers standing upon "whoever shall be injured in his business or property" by an unfair labor practice as defined in Sec. 8(b)(4) of the NLRB, 29 U.S.C. Sec. 158(b)(4). Section 8(b)(4) provides that it is an unfair labor practice for a labor organization:
 
 
 11
 (i) ... to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 
 
 12
 * * *
 
 
 13
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person....
 
 
 14
 In Seeley v. Brotherhood of Painters, Decorators and Paper Hangers of America, 308 F.2d 52, 61 (5th Cir.1962) (which is binding upon us), defendant labor unions had threatened plaintiff's employers with coercive measures such as strikes and the like unless they discharged plaintiff. Plaintiff sued, inter alia, under Sec. 303 of the LMRS, alleging that the object of unions' activities was to force or require plaintiff's employers to cease doing business with plaintiff. The court held that the words in Sec. 8(b)(4), "to cease doing business with any other person" do not contemplate the ordinary relation of employer and employee and dismissed the complaint.
 
 
 15
 Although Seeley involved a discharge rather than a secondary boycott, its general language is applicable to this case. The court stated
 
 
 16
 29 U.S.C.A. Sec. 158(b)(2), specifically dealing with a union's causing an employer to discharge "an employee" as defined by the act tends to indicate that the ordinary relation of employer and employee is not contemplated by the words in Section 158(b)(4) "to cease doing business with any other person." True, supervisors are excluded from the definition of employee [29 U.S.C.A. Sec. 152(3) ] and literally supervisors can come within section 158(b)(4) as "any other person." The question is not free from doubt. In our opinion, however, the purpose of the statute prevails over its literal wording. We do not think that the relation of employer and employee, including one employed as a supervisor, is that of "any other person" within section 158(b)(4).
 
 
 17
 308 F.2d at 60-61.
 
 
 18
 The claim of Oakman's employees for lost wages is also premised upon the language in Sec. 8(b)(4) "to cease doing business with any other person." Individual plaintiffs have alleged that the union miners interfered with the business relationship between individual plaintiffs and Oakman by causing Oakman's mining operations to cease. Under Seeley individual plaintiffs lack standing to sue pursuant to Sec. 303 of the LMRA.
 
 
 19
 Plaintiffs ask this court to adopt a more liberal approach to employee standing under Sec. 303. Section 303 confers a right to sue upon "persons" who are injured in their business or property by reason of a secondary boycott. An action lies under Sec. 303 when a union takes direct action against a neutral employer, for example, by refusing to handle the employer's goods, thus causing foreseeable injury to the neutral employer. International Longshoremen's Ass'n v. Allied International, Inc., 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982). Primary employers also have standing under Sec. 303 because they are the direct objects of the union's unlawful activity. Charvet v. International Longshoremen's Ass'n, AFL-CIO, 736 F.2d 1572, 1576 (D.C.Cir.1984). Although neutral and primary employers have standing under Sec. 303, most courts have adopted the general premise suggested in the legislative history that Congress intended to create some limitations on standing to sue under Sec. 303 and have denied standing to employees seeking relief under that section. See, e.g., Seeley; Charvet; Fulton v. Plumbers and Steamfitters, 695 F.2d 402 (9th Cir.1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983).
 
 
 20
 The old Fifth Circuit recognized that there must be some limitation to standing under Sec. 303 lest the section "give a cause of action to millions of persons for the same union activity." W.J. Milner & Co. of Florida v. International Brotherhood of Electrical Workers, Local 349, 476 F.2d 8, 13 (5th Cir.1973) (Godbold, J., concurring). In determining whether a plaintiff has a right to recover under Sec. 303 the fundamental question is "whether such a result if followed in all similar situations would threaten or undermine legitimate union interests." Id. at 12.
 
 In Fulton the Ninth Circuit explained:
 
 21
 The avowed purpose of the National Labor Relations Act is the promotion of industrial peace by the creation of stable collective bargaining relationships. 29 U.S.C. Sec. 151 (1973). The imposition of unlimited liability would tend to subvert our national labor policy. If employees of an injured concern are permitted to sue, unions would become subject to liability to a potentially huge class of plaintiffs.... The resultant financial burden may have a destabilizing effect upon the union and render it incapable of effective representation. Moreover, the threat of such liability may inhibit legitimate union activity, frustrating the exercise of rights granted by the National Labor Relations Act.
 
 
 22
 695 F.2d at 408.
 
 
 23
 The Sixth Circuit found employee standing to sue pursuant to Sec. 303 in Wells v. International Union of Operating Engineers, AFL-CIO, Local 181, 303 F.2d 73, 75 (6th Cir.1962). The court held that employees of a primary employer had standing to sue labor unions for damages resulting from secondary boycott activities because Sec. 303 conferred jurisdiction to permit "whoever" is injured to sue. This conclusion conflicts with the acknowledgement in Milner that there must be some limitation to Sec. 303 standing lest "unlimited liability ... produce financial disaster for unions and inhibit the exercise of the right to strike...." 476 F.2d at 12. Accordingly, following Milner we must reject Wells.
 
 
 24
 Plaintiffs ask this court to extend the holding in Milner to confer Sec. 303 standing upon employees. In Milner the court granted standing under Sec. 303 to a company whose contract gave it the exclusive right to sell building wire products for Southwire Company, the primary target of an allegedly unlawful secondary boycott. The complaint alleged that defendant unions had exerted unlawful secondary pressure against a number of South Florida electrical contractors seeking to persuade or induce them not to use Southwire's building wire products on their job sites, thereby causing Milner to lose commissions.
 
 
 25
 The Milner court enunciated two alternative tests to apply in determining whether a third party (i.e., a party neither a primary nor a neutral employer) has standing to sue under Sec. 303: (1) the third party was directly in the line of fire of the union's activity, or (2) the consequential damages suffered by the third party were reasonably foreseeable by the union. It is unclear from the opinion which test was adopted by the Milner court. See Milner, 476 F.2d at 13-14 (Godbold, J., concurring). Plaintiff employees in the instant case maintain that they were as much an object for the purposes of the illegal boycott activities as were Oakman and Prater, and therefore, they meet both tests enunciated in Milner.
 
 
 26
 Milner does not apply to this case. The test enunciated in Milner was applied to a business entity, not to an employee. Milner cannot be used to avoid the clear language of Seeley that the words in Sec. 8(b)(4), "to cease doing business with any other person" do not contemplate the ordinary relation of employer and employee. Accordingly, plaintiff employees lack standing to sue under Sec. 303.
 
 
 27
 II. The pendent state claims.
 
 
 28
 Plaintiffs invoked the court's pendent jurisdiction to entertain claims brought for alleged violations of Alabama law. The district court dismissed all state pendent claims as to individual plaintiffs.
 
 
 29
 For a court to have power to hear a pendent state claim, the court must have jurisdiction over a substantial federal claim, and "[t]he federal and state claims must derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 427 (11th Cir.1984).
 
 
 30
 There was no federal claim over the individual defendants to which plaintiffs could attach their pendent claims because the individual defendants were not properly in federal court. The only federal claim in this case was based on Sec. 303 of the LMRA which provides:
 
 
 31
 (b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section [regarding unfair labor practices] may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 [Sec. 301] of this title....
 
 
 32
 Section 303 grants jurisdiction to the district court to hear suits for damages sustained as a result of unfair practices as defined in Sec. 8(b)(4), but is subject to the limitations of Sec. 301 of the LMRA, 29 U.S.C. Sec. 185.
 
 Section 301(b) provides:
 
 33
 Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.
 
 
 34
 Section 303, as limited by Sec. 301, limits recovery against the union to the organization and its assets and forbids any recovery from the individual union members. Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 414, 101 S.Ct. 1836, 1844, 68 L.Ed.2d 248 (1981); Universal Communications Corporation v. Burns, 449 F.2d 691, 693-694 (5th Cir.1971). The district court correctly dismissed the Sec. 303 claims against the individual defendants.
 
 
 35
 Because there is no federal claim over the individual defendants, the court lacks jurisdiction over the individual defendants unless it can exercise its pendent party jurisdiction. Pendent party jurisdiction allows a plaintiff "who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction." Aldinger v. Howard, 427 U.S. 1, 14, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976).
 
 
 36
 In Aldinger plaintiff brought an action under 42 U.S.C. Sec. 1983 and pendent state claims against a county treasurer and the county. At the time Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961),[2] precluded a cause of action under Sec. 1983 against a county. The Aldinger Court held that the district court lacked jurisdiction to hear pendent state claims against the county. The Court distinguished cases like Gibbs which granted a federal court jurisdiction over state claims "derive[d] from a common nucleus of operative fact" when the defendant was already properly in federal court for a substantial federal cause of action. Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138. When, as in the present action, there is no independent basis of federal jurisdiction over the defendant against whom a state claim is made, the existence of the federal court's jurisdiction turns initially "upon the deductions which may be drawn from congressional statutes as to whether Congress wanted to grant this sort of jurisdiction to federal courts." Aldinger, 427 U.S. at 17, 96 S.Ct. at 2421.
 
 
 37
 In Aldinger the Court determined that Congress had excluded counties from liability under Sec. 1983, and therefore the district court lacked jurisdiction to hear pendent state claims against the county. In this case Congress has excluded individual union members from liability under Sec. 303. Accordingly, the district court lacked jurisdiction to hear pendent state claims against the individual defendants.
 
 
 38
 The issue of the district court's power to hear state claims brought by the individual plaintiffs against the unions presents a different question. Unlike the defendant county in Aldinger, the unions were properly in federal court under Sec. 303 of the LMRA. The Court's decision in Aldinger was limited to the issue of pendent party jurisdiction over a defendant with respect to a claim brought under 42 U.S.C. Secs. 1943(3) and 1983. "Other statutory grants and other alignments of parties and claims might call for a different result." Aldinger, 427 U.S. at 18, 96 S.Ct. at 2422.
 
 
 39
 Individual plaintiffs alleged jurisdiction over defendant unions under Sec. 303 of the LMRA. The dismissal of plaintiffs' Sec. 303 claim did not preclude the district court's exercise of jurisdiction over their pendent state claims. See Gibbs (pendent jurisdiction existed to hear state claims derived from a common nucleus of fact even though no claim was cognizable under Sec. 303); Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982) ("a federal court may retain pendent jurisdiction over a state claim ..., even though all federal claims have been dismissed.")
 
 
 40
 Where the district court has the power to entertain the pendent state claims, however, it need not do so. Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139; Wheelabrator-Frye, 735 F.2d at 427.
 
 
 41
 The district court's discretionary decision whether or not to entertain pendent state claims is guided generally by four factors: (1) whether state law claims predominate in terms of proof, the scope of the issues raised, or the comprehensiveness of remedy sought; (2) whether comity considerations warrant determination by a state court (i.e., is the state claim novel or particularly complex such that an accurate definitive interpretation of state law is necessary); (3) whether judicial economy, convenience, and fairness to the litigants would best be served by trying the federal and state claims together; and (4) whether "the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong ..."
 
 
 42
 Wheelabrator-Frye, 735 F.2d at 428.
 
 
 43
 In this case the state claims are closely connected with the Sec. 303 claim and arise out of a common nucleus of fact. Plaintiffs have alleged state claims for interference with economic relations, assault, battery, and false imprisonment, none of which is novel or particularly complex. Defendant unions are already in federal court under Sec. 303, and the same issues of fact will be raised for the state and federal claims; considerations of judicial economy, convenience, and fairness to the litigants counsel a trial of both federal and state claims before the same tribunal. Finally, the state claims are closely tied to the federal policy of protecting neutral employers and their employees against secondary boycotts. See S.Rep. No. 187, 86th Cong., 1st Sess. 78, reprinted in 1959 U.S. Code Cong. & Ad. News, 2318, 2382 ("The basic justification for banning secondary boycotts is to protect genuinely neutral employers and their employees, not themselves involved in a labor dispute, against economic coercion designed to give a labor union victory in a dispute with some other employer.")
 
 
 44
 One other consideration indicates that the district court abused its discretion in dismissing individual plaintiffs' state claims. By the time the district court dismissed the state claims the statute of limitations had expired and a state forum no longer was available to hear the case. Previous decisions of this court indicate that dismissal of the state claims may be an abuse of discretion where the statute of limitations has run. See Wheelabrator-Frye, 735 F.2d at 428 and cases cited therein. "That a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved." Pharo v. Smith, 625 F.2d 1226, 1227 (5th Cir.1980).
 
 
 45
 Defendants' reliance on Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., 711 F.2d 989 (11th Cir.1983) is misplaced. In Quality Foods, the court dismissed the pendent state claims of one of the plaintiffs although the statute of limitations had run, because the plaintiff had never been properly in federal court. The claim concerned an alleged antitrust violation in the frozen vegetable market; the plaintiff had been dismissed from the action on the grounds that its claim for lost profits on reconditioned auto parts could not be proximately caused by the alleged antitrust violation. However, the court remanded the case to the district court to reconsider its dismissal because the statute of limitations had run for the state claims of the plaintiff that was in the frozen vegetable business.
 
 
 46
 Both criteria of Gibbs have been satisfied for individual plaintiffs' state claims against the unions. The state claims have been appended to a substantial federal claim and the state and federal claims derive from a common nucleus of operative fact. 383 U.S. at 725, 86 S.Ct. at 1138.
 
 
 47
 Individual plaintiffs' claims were sufficiently substantial. The question for jurisdictional purposes is not whether the claims are without merit but whether prior decisions inescapably render the claims frivolous. Wheelabrator-Frye, 735 F.2d at 427. Individual plaintiffs' Sec. 303 claims were not inescapably frivolous. Relying on language in Milner, plaintiffs made out a colorable argument for Sec. 303 standing. Their claims for lost wages and damages for assault, battery and false imprisonment arose out of the same alleged secondary boycott activity that gave rise to the Sec. 303 claims. Accordingly, dismissal of plaintiffs' state claims must be reversed.
 
 
 48
 III. The statute of limitations.
 
 
 49
 Plaintiffs filed suit more than six months after the events giving rise to this action occurred. Defendants maintain that the district court should have applied the six-month statute of limitations found in Sec. 10(b) of the NLRA, 29 U.S.C. Sec. 160(b) and dismissed the Sec. 303 claims.
 
 
 50
 Section 303 contains no statute of limitations. When federal law is silent on the matter, courts will generally apply the most closely analogous statute of limitations under state law. DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983). But courts should borrow a limitations period from federal law "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking...." Id.
 
 
 51
 In DelCostello the Court held that the Sec. 10(b) six-month statute of limitations applies to a hybrid Sec. 301 duty of fair representation suit brought by an employee under Sec. 301 of the LMRA, 29 U.S.C. Sec. 185, against an employer for breach of the collective bargaining agreement and against a union for breach of its duty of fair representation. The Court concluded that state law provided no adequate analogy to the hybrid suit but that federal law provided a close analogy between unfair labor practices and a plaintiff's claims against the union for breach of its duty of fair representation and against the employer for breach of a collective bargaining agreement. The Court explained that the six-month limitation period of Sec. 10(b) was "actually designed to accommodate a balance of interests very similar to that at stake" in a hybrid Sec. 301 suit. 462 U.S. at 169, 103 S.Ct. at 2293. Those interests included the facilitation of the relatively rapid final resolution of labor disputes favored by federal law and the implementation of a nationally uniform statute of limitations.
 
 
 52
 The interests at stake in this case differ from those in DelCostello. A uniform six-month statute of limitations is suitable for hybrid Sec. 301 suits to facilitate and protect "those consensual processes that federal labor law is chiefly designed to promote--the formation of the collective bargaining agreement and the private settlement of disputes under it." 461 U.S. at 163, 103 S.Ct. at 2289. But this action was instituted under Sec. 303 of the LMRA for alleged secondary boycott activity. As the court noted in Monarch Long Beach Corp. v. Soft Drink Workers, Local 812, International Brotherhood of Teamsters, 762 F.2d 228, 231 (2d Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985):
 
 
 53
 Section 303 suits simply do not implicate the same concerns [as hybrid Sec. 301 suits]. Although it depends on the commission of an unfair labor practice by the union, specifically a secondary boycott, the section 303 cause of action involves parties who are otherwise completely unrelated. The dispute upon which liability is predicated is not a collective bargaining dispute; it does not arise within the context of a labor-management relationship. Labor peace will not be disrupted if section 303 suits are not rapidly resolved.
 
 
 54
 Moreover, the general rule still directs a court to adopt the most closely analogous state statute of limitations when none is provided under federal law. The DelCostello court itself cautioned:
 
 
 55
 We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere.... [R]esort to state law remains the norm for borrowing of limitations periods.
 
 
 56
 462 U.S. at 171, 103 S.Ct. at 2294. In accordance with the general rule we turn to state law for an appropriate statute of limitations.[3] The Sec. 303 claim for damages resulting from the alleged secondary boycott activity is most analogous to state actions for "injury to the person or rights of another not arising from contract" which in Alabama are subject to a one-year limitations period. Ala.Code Sec. 6-2-39(a)(5) (1975), in effect at the time this suit was filed.[4] The district court was correct in applying Alabama's one-year statutory period.
 
 
 57
 IV. Liability.
 
 
 58
 District 20 contends that the evidence was insufficient to establish liability under Sec. 303.
 
 
 59
 A union is not liable for the acts of its members unless it or one of its agents participated in, authorized, or ratified the acts of its members. Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 216-18, 100 S.Ct. 410, 413-15, 62 L.Ed.2d 394 (1979); North River Energy Corp. v. United Mine Workers of America, 664 F.2d 1184, 1191-94 (11th Cir.1981). In this case plaintiffs introduced sufficient evidence of participation, authorization, and ratification by the unions.
 
 
 60
 Between December 6, 1977 and February 2, 1978 there were several serious incidents of mass violence by members of District 20 and of the International, involving confrontations with the Alabama Highway Patrol at various non-union mines in North Alabama. On more than one occasion the governor of Alabama called to the capitol top officials of the International and of District 20 and urged them to stop the violence at the non-union mines. Representatives of both unions promised that they would do their best to stop the violence. The district court found that, despite their promises, union leaders did nothing to stop or to discourage the violent interference with the operation of non-union mines.
 
 
 61
 By failing to take any action to stop the violence, union officials acquiescenced in or ratified the illegal activities of the union miners. See Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446, 457 (5th Cir.1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971) (even though union agent may have advised employees of secondary employer to return to work, his failure to take action which could reasonably have been expected to effectuate this end was evidence of the union's acquiescence and condonation of the illegal activity).
 
 
 62
 A union is not required to use its "best efforts" or "all reasonable means" to assure compliance with the LMRA by the union's rank-and-file. Carbon Fuel. A union may agree to assume greater responsibility for ending illegal strikes than that imposed by law. United Steelworkers of America v. Lorain, 616 F.2d 919, 922 (6th Cir.1980), cert. denied, 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981). Liability is not imposed in the absence of language so requiring. Penn Packing v. Amalgamated Meat Cutters Local 195, 497 F.2d 888 (3d Cir.1974). In this case the unions assumed a greater responsibility than that imposed by the law by promising to do their best to stop the violence. The district court found that, despite their promise, union officials never issued any order against violence, never repudiated a single illegal action by a union member, never investigated a single incident of violence, and never attempted to discipline a single member.
 
 
 63
 In Latas Libby's, Inc. v. United Steelworkers of America, 609 F.2d 25 (1st Cir.1979), the court held that the language in the "no strike" clause of a collective bargaining agreement stating that "No officer or representative of the Union or employee shall authorize, instigate, aid or condone [any strike]" imposed an obligation on the union to take some affirmative steps toward ending a strike and that failure of union officials to publicly disavow or censure the actions of the striking workers violated the provisions of the agreement. In this case, the promise by union officials imposed an obligation on the unions to take some affirmative steps to stop the violence. By failing to make any effort to repudiate the illegal activity or discipline union members, the unions breached their agreement.
 
 
 64
 The district court also held the unions responsible on a mass action theory. The Third Circuit in Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951, 963 (3d Cir.1975), cert. denied, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), has explained the rationale of the mass action theory as follows:
 
 
 65
 When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members.
 
 
 66
 The rule in this circuit for finding liability under the mass action theory requires that the union, functioning as a union, engaged in the illegal activity. North River Energy, 664 F.2d at 1194. Courts will find that a union is functioning as a union if there is sufficient authorization, condonation, or complicity by the union or its agents. See North River Energy; Vulcan Materials.
 
 
 67
 In this case there were over 1,000 union members at the Oakman incident. The failure of union officials to take any action to fulfill their promises to the governor and the Highway Patrol to do their best to end the violence constituted condonation of the illegal activities. Accordingly, the district court's finding of liability must be affirmed.
 
 
 68
 V. The evidentiary rulings.
 
 
 69
 A. Other confrontations between union members and the Highway Patrol
 
 
 70
 The district court admitted evidence concerning several serious incidents of mass violence by union members involving confrontations with the Alabama Highway Patrol at other non-union mines in North Alabama. District 20 contends that the evidence of these incidents was irrelevant, highly prejudicial, and therefore inadmissible.
 
 
 71
 In United States Steel Corp. v. United Mine Workers of America, 519 F.2d 1249 (5th Cir.1975), the court held that evidence of past unauthorized strikes was relevant and therefore admissible. "A series of strikes which arguably amount to a pattern of activity at the local and district levels ... may give rise to, or at least support an inference of union 'instigation, support, ratification, or condonation.' " Id. at 1256, quoting Central Appalachian Coal Co. v. WMWA, 376 F.Supp. 914, 923 (S.D.W.Va.1974).
 
 
 72
 Evidence of past confrontations between union miners and the Highway Patrol was relevant to the issue of participation, authorization, or ratification by the unions. The district court did not abuse its discretion in admitting this evidence.
 
 
 73
 B. Cupps' testimony.
 
 
 74
 District 20 also assigns as error the admission of the testimony of Cecil Cupps concerning a conversation between Cupps and Jack Robbins.
 
 
 75
 Robbins died before the trial. His deposition was read into the record pursuant to Fed.R.Civ.P. 32(a)(3) and Fed.R.Evid. 804(a)(4). Robbins' deposition indicated that District 20's agents Tom Youngblood and Bill Starnes were merely present during the incidents at the Oakman mine on February 2, 1978. Cupps testified that some time after the deposition had been taken, Robbins told him that union officials had been "enticing" union members during the Oakman incident.
 
 
 76
 Cupps' testimony was not hearsay; it was introduced to impeach Robbins' deposition. Although Robbins was a witness for plaintiffs (his deposition was read into the record by plaintiffs), the Federal Rules of Evidence permit a party to impeach his own witness. Fed.R.Evid. 607. The district court did not abuse its discretion in admitting Cupps' testimony.
 
 
 77
 VI. The jury charge.
 
 
 78
 District 20 contends that the district court's instructions regarding compensatory damages were confusing and therefore the jury's assessment of damages was incorrect. Quoted out of context, the charge is confusing. It reads:
 
 
 79
 You are not asked "to apportion" between Defendants. You must not apportion between Defendants. If you find that one Defendant was responsible proximately--proximately because he had a particular element of damage, and the other did not, you can differentiate. You can make a difference in amounts between them, but if you find that the compensatory damages, the actual damages, sustained by a Plaintiff is equally attributable or not just equally attributable--not equal--because you are not attributing.
 
 
 80
 The district court continued to explain that compensatory damages were recoverable from both defendants but that the amount was not to be duplicated. Despite this further explanation the jury asked for further clarification.
 
 
 81
 In answer to the jury's request the court responded:
 
 
 82
 Compensatory damages are not to be duplicated as far as recovering them is concerned, and only the largest amount of compensatory damages assessed against a particular defendant can be recovered against that defendant. However, punitive damages are an entirely separate matter and based on a separate theory, and punitive damages are therefore recoverable against a defendant against whom punitive damages are assessed, in addition to any compensatory damages assessed against that defendant.
 
 
 83
 The later charge is a proper statement of the law and was sufficient to correct the earlier statement.
 
 
 84
 District 20 submits that the jury's assessment of damages reveals that it was still confused. The jury assessed actual damages against District 20 of $14,911 under the federal count, which required only proof by a preponderance of the evidence, and actual damages of $175,789 under the state tort claim, which required the higher standard of "clear proof." The amount of damages awarded, however, was not necessarily dependent upon the burden of proof required to award damages but upon the amount of damages the jury believed was caused by the union under each count.
 
 
 85
 The only common count between the two defendants was the Sec. 303 claim. The jury found that the International and District 20 caused the same amount of damages under the Sec. 303 claim. Under the federal count, plaintiffs were permitted to recover the damages they sought for lost sales and business and for damage to their equipment and facilities. Under the state count plaintiffs also sought damages for interference with the employment relationship between plaintiff corporations and their employees. The jury properly could make a larger award under the state counts representating damages for the interference with plaintiff corporations' business relationships, i.e., the state torts. We cannot say that the jury's assessment of damages is based upon confusion.
 
 
 86
 AFFIRMED in part and REVERSED in part.
 
 
 87
 JOHNSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 88
 I concur in all of the majority's opinion except for part 1, which holds that the individual employees of Oakman Mining Company lack standing to sue the defendants under Section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C.A. Sec. 187. Because the majority's construction of that provision disregards its plain language, I dissent.
 
 
 89
 Section 303 of the LMRA confers standing to sue on "whoever shall be injured in his business or property" by reason of an "unfair labor practice," as defined in Section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C.A. Sec. 158(b)(4). The unfair labor practices forbidden by Section 8(b)(4) of the NLRA include threatening, coercing, or restraining any person engaged in commerce with the object of forcing or requiring any person to cease doing business with any other person.
 
 
 90
 In the instant case the defendants clearly engaged in an unfair labor practice against Oakman Mining Company and Prater Equipment Company. The defendants, who were not employees of Oakman or Prater, committed acts of violence and destruction against the employees of those companies with the object of forcing the companies to stop doing business during a nationwide coal strike.
 
 
 91
 Given the fact that the defendants' activities constituted an unfair labor practice against Oakman and Prater, Section 303 grants standing to whoever was injured by reason of those activities. The plain language of the statute does not confine standing to the companies who were the targets of the unfair practice. Obviously, the persons who are most likely to suffer the consequences of unfair labor practices against a company are not only the owners of the company but also the employees. If Congress had intended not to confer standing upon the employees, it surely would have said so. Wells v. International Union of Operating Engineers, AFL-CIO, Local 181, 303 F.2d 73, 75 (6th Cir.1962).
 
 
 92
 The majority misreads the case of W.J. Milner & Co. of Florida v. International Brotherhood of Electrical Workers, Local 349, 476 F.2d 8 (5th Cir.1973), to support the proposition that "whoever" does not mean "whoever." In Milner, the plaintiff had the exclusive right in South Florida to sell building wire products manufactured by Southwire Company. The defendant unions exerted unlawful secondary pressure against electrical contractors in South Florida seeking to induce them not to use Southwire's products. Milner sued to recover lost commissions. Finding that this consequence was "reasonably foreseeable by the unions," and that Milner was in the direct "line of fire" of the union's illegal activities, the former Fifth Circuit held that Milner had standing to sue under Section 303. Id. at 12.
 
 
 93
 While holding that Milner had standing, the Fifth Circuit cautioned in dictum that Section 303 did not confer standing upon every person who was neither a primary nor a neutral employer and who suffered remote damage as the result of secondary boycott activity. In concluding that Milner requires the rejection of the Sixth Circuit's opinion in Wells, supra, the majority relies solely upon this dictum in Milner and upon language in Judge Godbold's special concurrence in that case.
 
 
 94
 Even assuming arguendo that Milner holds that Section 303, contrary to its plain language, does not confer standing on "whoever" is injured by reason of an unfair labor practice, Milner certainly requires us to confer standing upon the individual employees in this case. There is no doubt that the employees in the present case, to an even greater extent than the commissioned sales agent in Milner, were directly in the "line of fire" of the union's activities. The damages which the employees in this case suffered were not merely "reasonably foreseeable"--the damages were directly and intentionally inflicted by the unions. The unions sought to force Oakman and Prater to shut down through threats of violent attacks against the employees of those companies, and through the destruction of the employees' property. The damage suffered by the employees was "the substantial equivalent of the result which would have been produced if [they, and not Oakman and Prater,] had been the primary object of the union's secondary activity." Milner, supra, 476 F.2d at 12.
 
 
 95
 The majority opinion attempts to distinguish Milner from the instant case by noting that "[t]he test enunciated in Milner was applied to a business entity, not to an employee." Ante at 1206. The Fifth Circuit's conclusion in Milner had nothing to do with the issue of whether Milner was a business entity or not. On the contrary, the court stated that the issue before it was the right to sue under Section 303 of parties who were neither neutral nor primary employers. Milner, supra, at 10.
 
 
 96
 The majority's reliance on the case of Seeley v. Brotherhood of Painters, Decorators, and Paper Hangers of America, 308 F.2d 52 (5th Cir.1962), is misplaced. That case involved the issue of whether a union's interference in the relationship between an employer and an employee was an unfair labor practice, within the meaning of Section 8(b)(4) of the NLRA. The court held that the definition of "unfair labor practice" in that statute did not contemplate a situation where a union forced an employer to "cease doing business" with its employee. Id. at 60-61. Seeley is completely inapposite in the instant case, for here there is no question that the unions' violent and destructive activities constituted an unfair labor practice against Oakman and Prater, and the only question is whether the severely injured and damaged employees of those companies have standing to sue.
 
 
 97
 In my judgment, Section 303 confers standing on the individual plaintiffs in this case to recover damages from the defendants under federal law. The majority misconstrues Section 303 to in effect immunize the unions from the bulk of liability under federal labor law for the damages which they intended to cause and did in fact cause through their illegal activities. This could not have been the intent of Congress in enacting a broad standing provision to permit recovery by the victims of unfair labor practices. Accordingly, I dissent.
 
 
 
 [1]
 District 23 and individual union members were also named as defendants, and the complaint alleged that defendants conspired to deprive, and deprived plaintiffs of their rights under the First Amendment and their right to engage in interstate commerce, in violation of 42 U.S.C. Secs. 1985(3) and 1986. The district court dismissed all claims against District 23 and individual union members as well as Secs. 1985(3) and 1986 claims and eliminated the claim of Prater for tortious interference with contract because Prater was not qualified to do business in Alabama and therefore could not enforce its contracts in Alabama. Accordingly, Prater could not maintain a claim under a theory of interference with its contracts. None of these dispositions has been questioned on appeal
 
 
 [2]
 The holding in Monroe v. Pape that municipal corporations were immune from suit under Sec. 1983 later was overruled in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)
 
 
 [3]
 Two other post-DelCostello cases have involved the issue of whether to apply the Sec. 10(b) limitations period to a Sec. 303 suit. Both the Sixth and the Second Circuits have held that state law should provide the appropriate statute of limitations. See Carruthers Ready-Mix, Inc. v. Cement Masons Local Union No. 520, 779 F.2d 320 (6th Cir.1985); Monarch Long Beach, supra
 
 
 [4]
 Ala.Code Sec. 6-2-39(a)(5) has been repealed and replaced by Sec. 6-2-38(l) (1985) which provides a two-year statute of limitations for "actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section...." This suit was filed in 1979 when the one-year statute of limitations was in effect. Under Alabama law "the repeal of a statute of limitations does not impair a bar perfected before the repeal." Martin v. Martin, 35 Ala. 560 (1860). Therefore the one-year limitations period applies in this case